UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

CHRIS MOSES HENRY, SR.,

                          Plaintiff,          14-CV-0838(MAT)

            v.                                **DECISION**
                                              **and ORDER**
CAROLYN W. COLVIN, Commissioner
of Social Security,

                          Defendant.
_____

## INTRODUCTION

     Chris Moses Henry, Sr., ("Plaintiff"), who is represented by
counsel, brings this action pursuant to the Social Security Act
("the Act"), seeking review of the final decision of the
Commissioner of Social Security ("the Commissioner") denying his
applications for Disability Insurance Benefits ("DIB") and
Supplemental Security Income ("SSI"). This Court has jurisdiction
over the matter pursuant to 42 U.S.C. § 405(g). Presently before
the Court are the parties' motions for judgment on the pleadings
pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.
Dkt.##11, 17.

## BACKGROUND

**A.   Procedural History**

     Plaintiff protectively filed applications for DIB and SSI on
July 28, 2009, alleging disability beginning July 1, 2009 due a
back disorder. T. 97-98, 120, 126-33, 243-50.[1] His initial

_____

     [1] Citations to "T.__" refer to the pages of the
administrative transcript.

applications were denied, and a hearing followed before Administrative Law Judge ("ALJ") Robert T. Harvey in Buffalo, New York on February 15, 2011. T. 62-90, 98, 120, 126-33. After The ALJ issued a decision finding that Plaintiff was not disabled, Plaintiff requested Appeals Council review of the hearing decision. T. 99-109, 176-79. On July 23, 2012, the Appeals Council vacated the ALJ's previous hearing decision and remanded the case for further administrative proceedings. T. 121-25.

A supplemental hearing was held before ALJ Harvey on December 3, 2012, and a decision was issued thereafter finding Plaintiff not disabled. T. 13-27, 35-61. Plaintiff requested further review, which the Appeals Counsel denied on August 20, 2014. T. 1-6. Plaintiff commenced this timely action, and now seeks judgment on the pleadings reversing or remanding the final decision of the Commissioner. Dkt. ##1, 11.

The Commissioner cross-moves for judgment on the pleadings asserting that the ALJ's decision was supported by substantial evidence. Dkt. #17-1.

**B.   The ALJ's Decision**

In applying the familiar five-step sequential analysis, as contained in the administrative regulations promulgated by the Social Security Administration ("SSA"), see 20 C.F.R. §§ 404.1520, 416.920; Lynch v. Astrue, No. 07-CV-249, 2008 WL 3413899, at *2 (W.D.N.Y. Aug. 8, 2008) (detailing the five steps), the ALJ found:

(1) Plaintiff did not engage in substantial gainful activity since January 1, 2008; (2) he had the severe impairment of degenerative disc disease of the lumbar spine, and non-severe impairments of bilateral Carpal Tunnel Syndrome, headaches, first right carpal metacarpal arthrodesis of the right hand, and right knee condition; (3) his impairments did not meet or equal the Listings set forth at 20 C.F.R. § 404, Subpt. P, Appx. 1. The ALJ found that retained the residual functional capacity ("RFC") to perform a range of medium work, with occasional limitations in bending, climbing, stooping, squatting, kneeling, crawling, pushing/pulling with upper extremities, and with no exposure to cold; (4) Plaintiff could not perform his past relevant work as a truck driver; and (5) there was other work that existed in significant numbers in the national economy that Plaintiff could perform. T. 19-27.

## DISCUSSION

## I.   Scope of Review

A federal court should set aside an ALJ decision to deny disability benefits only where it is based on legal error or is not supported by substantial evidence. Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003) (internal quotation marks omitted).

3

II.  **Relevant Medical Evidence**

A.  **Treating Sources**

1.  **Primary Care**

Plaintiff underwent a physical therapy evaluation on October 26, 2005. He did not return for treatment and was discharged on November 30. T. 529.

On March 23, 2006, Plaintiff underwent another physical therapy consultation for back pain and was prescribed postural education and exercises, and had a good prognosis. T. 530-34. After missing three appointments, Plaintiff was discharged from physical therapy. T. 524.

Plaintiff received routine medical treatment from Dr. Jeanette Figueroa at UB Family Medicine from 2006 to 2012. On November 29, 2006, Plaintiff had an initial checkup and reported back pain. Examination results, including musculoskeletal, were normal. Dr. Figueroa diagnosed Plaintiff with backache, unspecified, and recommended a colonoscopy, which Plaintiff refused. T. 414-15. On December 21, 2006, Dr. Figueroa observed tenderness of the spine in the lower lumbar region, with no spasms, no instability, full strength, muscle tone, and range of motion upon examination. T. 419-420. She continued Plaintiff's Lortab and ordered a urine drug screen. Id.

In February, 2007, Plaintiff complained of worsening back pain, and reported that he ran out of Lortab and had used THC and

4

cocaine prior to signing a narcotic agreement. Dr. Figueroa ordered another urine drug screen. T. 422-23.

Plaintiff's musculoskeletal examination results were normal, except for tenderness in the lumbar spine on March 22, 2007. T. 425. He was referred for pain management by Dr. Figueroa and had his pain medication refilled. Id.

Dr. Figueroa completed a Medical Examination for Employability Assessment Form on March 27, 2007, indicating Plaintiff's conditions and treatments, but declined to indicate any physical functional limitations, stating that she would need a "functional capacity evaluation to complete above [functional limitations]." Under the heading, "Limitations on Work Activities" she noted that she would await recommendations from the pain specialist. T. 514-15.

In June, 2007, Dr. Figueroa discontinued Plaintiff's narcotic pain medication due to the results of a urine toxicology screen. T. 431.

Plaintiff saw Dr. Figueroa again on November 11, 2008, upon complaints of chronic low back pain without radiation, and pain in his joints, right knee, and right elbow. T. 503. Upon examination, he walked with a partially bent right knee gait, mild right knee effusion, and right knee tenderness. Plaintiff exhibited no lumbar tenderness, and had full range of motion in his hips. Dr. Figueroa

prescribed pain medication and referred Plaintiff for diagnostic testing. T. 504.

Approximately nine months later, in August, 2009, Plaintiff again saw Dr. Figueroa upon complaints of worsening back pain. Examination results revealed normal gait, spinal curvature, tenderness of the spine in the lumbar region, spasms noted, forward flexion of the hips >60, extension ~30, full rotation and lateral bending with discomfort on the left. Straight leg raise was negative bilaterally, lower extremities were normal to inspection and palpation. Strength and muscle tone were normal with full range of motion. He could walk on his heels and toes and had 2+ deep tendon reflexes. T. 500-01. Physical therapy was recommended and Plaintiff was re-started on pain medication. Id.

On October 9, 2009, Plaintiff presented with complaints of wrist tenderness. A positive Tinel's sign was noted on examination, and Dr. Figueroa diagnosed Plaintiff with Carpel Tunnel Syndrome. She declined to prescribe Plaintiff narcotics due to multiple cocaine-positive urine tests. T. 495-96.

Dr. Figueroa completed a Physical Assessment for Determination of Employability on November 5, 2009, in which she diagnosed low back pain and scoliosis. She declined to provide an estimate of Plaintiff's functional limitations, deferring to a pain management specialist. She opined that Plaintiff could not work for 3 to 6 months. T. 489-90.

Between 2009 and 2012, Plaintiff continued treatment with Dr. Figueroa and continued to complain of worsening back pain. His examination results during this time period were largely unchanged. T. 574-75, 670, 666-69, 726, 728, 731, 757, 762-64. In June, 2011, Plaintiff had been discharged by his pain specialist, and Dr. Figueroa declined to prescribe him narcotics for pain management. T. 666-69. He did not attend physical therapy during this time. T. 726. Plaintiff was prescribed hand splints in January, 2011, but he reported to the consultative examiner that they did not help. T. 592-94, 675, 780-83.

### 2.   Pain Management

Plaintiff also received treatment from Dr. Pratibha Bansal, a pain specialist. Dr. Bansal diagnosed Plaintiff with scoliosis of the thoracic spine and myofascial pain in the low back and leg muscles on July 17, 2007. Exercise was prescribed. T. 407-09.

When Plaintiff returned one month later, he reported that the stretching exercises were helping, and that he was more flexible and walking better. T. 410. On October 9, 2007, Plaintiff reported that he was doing stretches at home, but that he missed two physical therapy appointments and was discharged. He further reported that his Lortab was not enough and his muscles had stiffened. Plaintiff was referred to another physical therapy office and his Lortab was increased. T. 412. Dr. Bansal indicated

7

that Plaintiff was tentatively discharged from her care if he did not continue with physical therapy two times per week. T. 413.

On November 6, 2007, Plaintiff's toxicology screen revealed the presence of cocaine and cannabis. T. 507. As a result, Dr. Bansal discontinued pain medication. T. 506.

Plaintiff resumed treatment with Dr. Bansal in January, 2010, reporting pain in both wrists and lower back. T. 554. Dr. Bansal prescribed an exercise program and Lortab. T. 556-57. The following month, Plaintiff told the doctor that he had been doubling up on his Lortab and had to decrease his activities due to pain. T. 558. He showed a minimal amount of myofascial pain and was tender over the L5-S1 facet joints upon examination. Dr. Bansal recommended an exercise program and prescribed Lortab. T. 559.

In March, 2010, Dr. Bansal diagnosed Plaintiff with idiopathic scoliosis and kyphoscoliosis, backache, and insomnia. She noted extensive myofascial pain and tenderness over the L5-S1 facet joints, and prescribed Lortab, Ultracet, and Baclofen. T. 479-80.

A CT scan of the lumbar spine dated May 20, 2010 showed no acute fracture, Grade I anterior spondylolisthesis of L4 over L5, and a broad-based disc bulge and facet arthritis and hypertrophy of the ligamentum flaving, all causing central canal stenosis at L4-L5. T. 723.

On July 14, 2010, Dr. Bansal noted that Plaintiff's urine toxicology screen was positive for cocaine and THC, and declined to

write further prescriptions for narcotics. T. 567. Injections and physical therapy were recommended. Id. Plaintiff was discharged from Dr. Bansal's practice and was referred to a different pain management doctor. T. 577-78.

### 3.   Orthopedic Treatment

Plaintiff was seen by orthopedic surgeon Dr. Owen Moy on December 7, 2010 for right hand dysfunction. T. 585-87. X-rays of the right wrist indicated an element of first CMC arthrosis. T. 586. After evaluation, Plaintiff was diagnosed with peripheral nerve entrapment, possibly cubital tunnel, through by history carpal tunnel; CMC arthritis at the right thumb; rupture of extensor pollicis longus tendon. T. 586. Subsequent nerve conduction studies and EMG were unremarkable, with negative results for Carpal Tunnel Syndrome or radial nerve dysfunction. T. 588. Dr. Moy recommended hand therapy and gave Plaintiff an injection. T. 592-94.

### B.   Consultative Examinations

Plaintiff was consultatively examined by Cindrea Bender, M.D., on September 1, 2009. T. 439-44. Subjectively, Plaintiff complained of bilateral wrist pain that radiated to the palm; difficulty grasping, gripping, and maneuvering with his hands; and lower back pain without radiation the ranged in pain from 6/10 to 2/10 with medication. T. 439.

Plaintiff exhibited normal gait, full squat, normal station, could heel-toe walk, and needed no assistive devices nor help changing for the examination. He could rise from a chair without difficulty. T. 440. Musculoskeletal examination revealed 0 degree lumbar spine extension, 70-degree flexion, and positive scoliosis convexity to the left, with all other findings negative. T. 441. An x-ray of the lumbar spine showed degenerative changes status post gunshot wound dating back to 1984. T. 439-42. Dr. Bender diagnosed Plaintiff with lower back pain, per history, and bilateral Carpal Tunnel Syndrome, per history. She opined that Plaintiff had moderate limitations in excessive bending, pushing pulling, carrying, or lifting heavy objects; and mild limitations with grasping, gripping, maneuvering, handling objects, and fingering. T. 442.

Donna Miller, D.O., consultatively examined Plaintiff on September 13, 2011, noting that prolonged sitting and standing increased Plaintiff's back pain, and lying down helped alleviate it. T. 675-78. Plaintiff reported that holding, gripping, and grasping were painful. Upon examination, he was only able to squat 50% and had decreased range of motion in the lumbar spine. T. 677. Dr. Miller diagnosed Plaintiff with chronic low back pain, spinal stenosis, bilateral Carpal Tunnel Syndrome, right ganglion cyst, and left shoulder pain, post-stabbing. She opined that Plaintiff

10

had mild limitations with repetitive heavy lifting, bending, turning, and repetitive use of his wrists bilaterally. T. 678.

III. **<u>Non-Medical Evidence</u>**

Plaintiff was born in 1954, had a high school equivalency diploma, and served in the U.S. Army from 1972 to 1975 after which he received an honorable discharge. T. 66-67. He previously worked as a truck driver, assistant manager, and performed janitorial services. T. 69, 78-79. At the time of both hearings, he was working part-time at a senior center performing light janitorial services with frequent breaks. T. 40, 69.

At his hearings, Plaintiff testified that he suffered headaches, back pain, left leg pain, arthritis in his right thumb, and a left shoulder problem. T. 41-42, 49-50, 70-72. He stated that he cooked, shopped for groceries, and went to church, and that he could lift about 10 pounds but had trouble grasping objects. T. 48-49, 80-81.

Vocational Expert Jay Steinbrenner testified at the supplemental hearing on December 3, 2012 that Plaintiff's past relevant work as a truck driver was classified as semi-skilled medium. T. 51-58, 63, 233-35. Mr. Steinbrenner was asked by the ALJ to consider a person of Plaintiff's age, education, and no past relevant work, who retained the residual capacity to perform medium work, with occasional bending, climbing, stooping, squatting, kneeling, crawling, pushing/pulling with upper extremities, and no

exposure to cold. The vocational expert testified that such an individual could not perform Plaintiff's past work, but could perform other work in the national economy, such as commercial laundry work and packaging machine operator. T. 53-55.

## IV. <u>The decision of the Commissioner was supported by substantial evidence.</u>

### A. Residual Functional Capacity Analysis

Plaintiff first contends that the ALJ erred in finding him capable of medium work with some additional physical limitations. Pl. Mem. 13-14. Specifically, he argues that neither of the two medical opinions cited support the finding that Plaintiff could perform medium work. <u>Id.</u>

Although the determination of a claimant's RFC is reserved for the Commissioner, <u>see</u> 20 C.F.R. § 416.927(e)(2), an RFC assessment "is a medical determination that must be based on probative medical evidence of record.... Accordingly, an ALJ may not substitute his own judgment for competent medical opinion." <u>Lewis v. Comm'r</u>, No. 00 CV 1225, 2005 WL 1899399, *3 (N.D.N.Y. Aug. 2, 2005) (citing <u>Rosa v. Callahan</u>, 168 F.3d 72, 79; <u>Balsamo v. Chater</u>, 142 F.3d 75, 81 (2d Cir. 1998) (citation omitted)). An ALJ may not "pick and choose" from the medical evidence only those parts that favor a finding of no disability. <u>E.g.</u>, <u>Lynch v. Astrue</u>, No. 09-CV-623, 2011 WL 2516213, at *8 (W.D.N.Y. June 21, 2011) (citations omitted).

Here, the ALJ analyzed the treatment records of Plaintiff's treating physicians, Drs. Figueroa and Bansal, at length, in addition to thoroughly discussing opinions of the consultative examiners. T. 20-23. The ALJ gave the opinions of Drs. Bender and Miller "some, but not great weight." T. 21, 23.

Dr. Miller opined that Plaintiff had mild limitations with respect to repetitive heavy lifting, bending, and turning, and no limitations were noted with regard to Plaintiff's ability to sit, stand, or walk. T. 678. This is consistent with "medium work" as provided by the regulations, which is characterized as lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. 20 C.F.R. § 404.1567(c); 416.967(c). The ALJ did, however, discredit Dr. Miller's opinion to the extent it assessed a severe impairment in Plaintiff's wrists, as Plaintiff's physical examination and the remainder of the medical evidence did not support disabling Carpal Tunnel Syndrome. T. 23; see, e.g., T. 588 (unremarkable nerve conduction and EMG); T. 677 (clinical findings indicating Plaintiff's hands and wrist functions were normal). Thus, the ALJ reasonably declined to afford controlling weight to Dr. Miller's opinion. See generally, 20 C.F.R. § 404.1527.

Dr. Bender opined that Plaintiff had moderate limitations with respect to excessive bending, pushing, pulling, carrying, or lifting heavy objects secondary to low back pain; and mild

13

limitations with grasping, gripping, maneuvering, handling objects, and fingering secondary to bilateral Carpal Tunnel Syndrome. T. 442. These limitations are likewise consistent with the parameters of the "medium" exertion level of work. In any event, the ALJ gave Dr. Bender's opinion only some weight on the basis that Plaintiff's vast treatment history did not support such extensive limitations. T. 21; see, e.g., T. 440-42 (normal examination results by consultative physician); T. 561 (treating physician noted normal sensory, motor, and deep tendon reflexes in the lower extremities); T. 592 (unremarkable nerve conduction and EMG). The ALJ therefore properly evaluated the opinion evidence of the consultative examiners and concluded that it supported the residual functional capacity finding.

Plaintiff continues to argue that even if those opinions supported the RFC finding, they were far too vague for the ALJ to rely upon. Pl. Mem. 14.

In Curry v. Apfel, 209 F.3d 117, 123 (2d Cir. 2000), the Second Circuit held that an opinion from a consultative examiner that a claimant has "mild" or "moderate" limitations, "without additional information," were "so vague as to render [the opinions] useless[.]" Unlike Curry, however, the opinions of the consultative examiners here were generally supported by the individual examinations of Plaintiff, and were also consistent with the other evidence in the medical record which supported that Plaintiff

suffered from back pain and a hand/wrist condition that resulted in some functional limitations, but that these impairments did not prevent him from working altogether.

The ALJ, citing to the relevant evidence, thoroughly discussed Plaintiff's physical health history, including his treatments and medications, his diagnostic tests, and the notes from his treating providers. T. 20-25. He highlighted that, among other things, Plaintiff had not been compliant with the recommended treatments of his physicians, that he had multiple urine screens that were positive for illegal drugs, and that his treating providers reported that Plaintiff ambulated with a normal gait, was in no apparent distress, and that Plaintiff himself had reported "doing well" on several occasions. Id.

The ALJ discussed Plaintiff's diagnostic test results from December, 2010, which revealed no Carpal Tunnel Syndrome and no radial nerve dysfunction. T. 22. The opinions of the consultative examiners were largely consistent with the treatment records and the ALJ's ultimate RFC finding. Although his examination results indicated some abnormality such as limited range of motion, the remainder of his evaluations were unremarkable. For example, Plaintiff exhibited normal gait and stance, and no issues with his extremities, no muscle atrophy, had full grip strength and dexterity, and he was able to zip, button, Velcro and tie with his hands. T. 21, 23. Where, as here, the opinions of the consultative

15

examiners were based on thorough medical examinations and were not inconsistent with the primary treatment records or the remainder of the record evidence, the reasoning supporting Curry is inapplicable. See Ashby v. Astrue, No. 11 Civ. 02010, 2012 WL 2477595, at *12 (S.D.N.Y. Mar. 27, 2012) (distinguishing Curry on similar grounds.

In sum, the Court finds that the ALJ properly assessed the opinion of the consultative examiners and that the ALJ's physical RFC determination was therefore supported by substantial evidence in the record.

In a related argument, Plaintiff claims that the ALJ's residual functional capacity finding was an improper assertion of medical expertise. Pl. Mem. 14. The Commissioner's regulations define "residual functional capacity" as the most a plaintiff can still do in a work setting on a regular and continuing basis despite his physical and mental limitations. 20 C.F.R. § 404.1545(a).

It is the responsibility of the ALJ to assess plaintiff's residual functional capacity based on all the relevant evidence in the case record. 20 C.F.R. § 404.1545(a). Further, "[t]he residual functional capacity assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." Social Security

Ruling ("SSR") 96-8p, 1996 WL 374184, at *7 (S.S.A.); <u>see also</u> <u>Balsamo</u>, 142 F.3d at 80-81.

Here, the ALJ assessed Plaintiff's residual functional capacity in accordance with the applicable regulations: he considered all of the pertinent medical evidence, and explained his reason for the weight he afforded the opinions of the consultative examiners regarding Plaintiff's hand/wrist impairment. T. 20-24. He considered Plaintiff's subjective complaints and activities of daily living. T. 24. Moreover, an RFC assessment may be expressed in terms of exertional levels of work, e.g., sedentary, light, medium, heavy, and very heavy. 20 C.F.R. §§ 404.1513(c)(1), 404.1569a(a), 416.969a(a). The ALJ therefore did not err in characterizing Plaintiff's RFC as the ability to perform medium work with certain limitations.

Although there was no function-by-function assessment present in the ALJ's decision, this alone does not warrant remand. <u>See</u> <u>Goodale v. Astrue</u>, 32 F. Supp. 3d 345, 357 (N.D.N.Y. 2012) ("This Court is inclined toward the view that, in limited circumstances, an ALJ's failure to provide a function-by-function analysis might constitute harmless error, provided that the absence of the analysis did not frustrate meaningful review of the ALJ's overall RFC assessment."). In <u>Goodale</u>, the district court found that the ALJ's failure to provide a function-by-function analysis of the claimant's functional limitations constituted harmless error where

an extensive medical history supported the RFC and the claimant's treating physicians declined to provide a functional assessment detailing his limitations. Id. at 357. Such is the case here. Plaintiff's progress notes from his treating physicians spanned approximately six years, and detailed Plaintiff's symptoms and course of treatment. Significantly, Plaintiff was discharged from his treating physicians for lack of compliance with prescribed medical treatment and multiple abnormal urine toxicology screens. T. 25. His primary physician Dr. Figueroa twice refused to provide an assessment of Plaintiff's functional limitations, and opined only that Plaintiff would not be able to work for 3-6 months. T. 489-90, 514-15.

It is apparent that the strength of record evidence supporting the ALJ's residual functional capacity determination renders any error by the ALJ harmless.

Finally, Plaintiff argues that his own subjective statements did not support the ALJ's residual functional capacity finding. Pl. Mem. 15. In his decision, the ALJ considered Plaintiff's subjective allegations of symptoms and activities of daily living, and found that his subjective complaints "suggest[ed] a greater severity of symptoms that can be shown by the objective medical evidence alone." T. 24. He further noted that Plaintiff's testimony was inconsistent regarding daily activities, he was not compliant with treatment recommendations, did not attend his physical therapy

18

appointments, and had multiple positive toxicology screens for cocaine. T. 25. The ALJ then concluded that Plaintiff's "apparent disinterest in conscientiously pursuing and fully following the appropriate medical treatment regimen clearly raises doubt concerning [his] motivation for optimum management of his symptoms." Id. Thus, not only did the ALJ follow the appropriate regulations in reaching Plaintiff's credibility determination, see 20 C.F.R. §§ 404.1529, 416.929 ; see also SSR 96-7p, he properly concluded that Plaintiff's statements, to the extent that his testimony was credible, supported an RFC of medium work with limitations and a finding that Plaintiff's symptoms were not limiting enough to prevent him from working. T. 24-25.

Accordingly, the Court finds that the ALJ's residual functional capacity determination was proper as a matter of law and supported by substantial evidence in the record.

## CONCLUSION

For the foregoing reasons, the Plaintiff's motion for judgment on the pleadings (Dkt.#11) is denied, and the Commissioner's cross-motion (Dkt.#17) is granted. The complaint is dismissed in its entirety with prejudice.

ALL OF THE ABOVE IS SO ORDERED.

S/Michael A. Telesca
_____
MICHAEL A. TELESCA
United States District Judge

Dated:     Rochester, New York
           December 4, 2015

19